**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No.  11-464 (JDB)** |
| **KATHLEEN SEBELIUS,** **Secretary, U.S. Department of Health and Human Services,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

The Secretary of the Department of Health and Human Services is responsible for administering Medicare.  Plaintiffs are three associated Philadelphia hospitals — Hospital of University of Pennsylvania, Presbyterian Medical Center, and Pennsylvania Hospital — that seek judicial review of the Secretary's denial of payments associated with services the hospitals provided to certain Medicare recipients in fiscal years 1999 and 2000.  The Medicare fiscal intermediary did not receive claims for these payments from plaintiffs in a timely fashion, and the Secretary determined that there was insufficient evidence to conclude that the claims were actually mailed by plaintiffs. Plaintiffs contend that they mailed claims for these payments to the intermediary and that, in any case, the Secretary failed to notify them of the timing requirements for mailing claims, making the deadlines invalid.  Plaintiffs also contend that, notice aside, the time limits were improper.

This Court previously remanded this matter to the Secretary to explain why plaintiffs had sufficient notice of the time limits for filing these claims and why the time limits were proper. The Court also concluded that the basis of the Secretary's finding that plaintiffs did not show they actually mailed the claims was contrary to law and remanded for further examination of whether the claims were, in fact, mailed.  In the meantime, the D.C. Circuit ruled in a similar case, Loma Linda Univ. Med. Ctr. v. Sebelius, 408 Fed. Appx. 383 (D.C. Cir. 2010), that hospitals were not put on notice of these deadlines.

On remand, the Secretary determined that plaintiffs, unlike Loma Linda, had notice of the deadlines and that the deadlines were proper.  The Secretary also concluded that plaintiffs presented insufficient evidence that the claims were mailed and received.  Plaintiffs then sought judicial review of the Secretary's decision.  Now before the Court are the parties' cross-motions for summary judgment.  For the reasons described below, the Court concludes that plaintiffs did not receive adequate notice of the relevant deadlines.  Accordingly, plaintiffs' claims must now be processed and paid.

I.  Statutory and Regulatory Background

a.  Claims Under Medicare Parts A & C

The Secretary of the Department of Health and Human Services, through the Centers for Medicare and Medicaid Services ("CMS" or "Administrator"), administers the Medicare statute, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq.  The Medicare program is divided into several parts, of which Parts A and C are relevant here.  Part A covers "inpatient hospital services" furnished to Medicare beneficiaries by participating providers, such as hospitals.  42 U.S.C. § 1395d(a)(1).  CMS itself is directly responsible for the costs of Part A

services.  Id.  To coordinate billing by and payment to hospitals under Part A, Medicare contracts

with fiscal intermediaries (usually private insurance companies) pursuant to 42 U.S.C. § 1395h.[1]

Medicare Part C was created by the Balanced Budget Act of 1997 ("BBA '97").  Under

Part C, beneficiaries may receive Medicare benefits through private health insurance plans called

"Medicare+Choice" plans.  See 42 U.S.C. § 1395w-21(a)(1).  Such plans — referred to by the

parties as "Medicare HMOs" — receive payment in advance from CMS for each enrollee and are

then responsible for the costs of the enrollees' services.  The Medicare HMOs themselves

coordinate billing and payment with health care providers once services have been provided.

See 42 U.S.C. § 1395mm(a).

Health care providers submit claims for services provided— either to fiscal

intermediaries (for services provided under Part A) or to Medicare HMOs (for services provided

under Part C) — and these claims are paid over the course of the year.  At year-end, hospitals file

cost reports with the fiscal intermediaries, which reconcile interim payments made over the

course of the year with actual reimbursements due.  See 42 C.F.R. § 405.1803.  The fiscal

intermediary makes a final determination, which is appealable to the Provider Reimbursement

Review Board ("PRRB" or "Board").  42 U.S.C. § 1395oo(a).  The PRRB's decision is subject to

further review by the CMS Administrator, and a hospital may seek review of the Administrator's

decision in federal district court.  See 42 U.S.C. § 1395oo(f).

To receive payment under Medicare Part A, hospitals submit claim forms (labeled "UB-

92" forms) to their fiscal intermediaries.  These claims are governed by the regulations set forth

at 42 C.F.R. § 424.30 et seq..  Among the requirements are time limits for filing claims, which

are codified at 42 C.F.R. § 424.44:

---

[1] The Court will refer interchangeably to "Medicare," "the Secretary," "HHS," "CMS," and "the Administrator," since nothing hinges on the distinction between these labels.

Basic limits. . . . [T]he claim must be mailed or delivered to the intermediary or carrier, as appropriate—

(1)     On or before December 31 of the following year for services that were furnished during the first 9 months of a calendar year; and

(2)     On or before December 31 of the second following year for services that were furnished during the last 3 months of the calendar year.

42 C.F.R. § 424.44(a).[2]   The first regulation in the set, § 424.30 (entitled "Scope"), describes what claims the requirements apply to.  Section 424.30 states:  "This subpart sets forth the requirements, procedures, and time limits for claiming Medicare payments.  Claims must be filed in all cases except when services are furnished on a prepaid capitation basis by a health maintenance organization (HMO), a competitive medical plan (CMP), or a health care prepayment plan (HCPP)."  Medicare Part C services are "services [that] are furnished on a prepaid capitation basis by a health maintenance organization (HMO)."[3]  Hence, claims that providers filed with HMOs for payment for services provided to Medicare Part C enrollees are exempted from the requirements. As explained in detail below, a key issue in this case is whether the regulatory exception, which clearly exempts claims filed with Medicare HMOs for services provided to Part C enrollees, also applies to claims filed with fiscal intermediaries for graduate medical education payments associated with the services provided to Part C enrollees.

b. <u>Medical Education Payments</u>

The Medicare program also pays teaching hospitals for certain costs related to graduate medical education.  Medicare makes both an "indirect graduate medical education payment" ("IME") and a "direct graduate medical education payment" ("GME").  IME payments are intended to reimburse teaching hospitals providing services to Medicare beneficiaries for their

---

[2] The regulations have since been modified slightly.

[3] The services "are furnished on a prepaid capitation basis by [an HMO]" because the Administrator prepays the HMO a certain amount per capita — hence, on a "prepaid capitation basis."

higher-than-average operating costs.  See 42 U.S.C. §§ 1395f(b), 1395ww(d).  Medicare makes a payment for each Medicare beneficiary discharged by a hospital.  See 42 U.S.C. §§ 1395ww(d), 1395w-21(i)(1).  The per-discharge payment increases depending on the hospital's ratio of medical residents to beds — i.e., the higher the number of residents or the higher the number of discharges, the greater the IME payment.  See 42 U.S.C. § 1395ww(d)(5)(B). The GME payment, on the other hand, is a payment intended to compensate teaching hospitals for the direct costs of graduate medical education incurred because of services provided to Medicare beneficiaries.  42 U.S.C. § 1395ww(h).  The amount of the GME payment depends on the number of full-time residents and the Medicare "patient load."  Hence, like the IME payment, the GME payment increases when the number of Medicare enrollees or the number of residents rises.  See id.  Both GME and IME payments, then, depend on the number of residents and the number of Medicare enrollees receiving services from a hospital.

Before the passage of BBA '97, only services provided to Medicare Part A or B beneficiaries were counted in calculating IME and GME payments.  That is, the "per-discharge" multiplicand for IME payments did not include discharges of Part C Medicare HMO enrollees, and the "patient load" multiplicand for GME payments did not include Part C Medicare HMO enrollees.  BBA '97, however, directed the Secretary to make additional IME and GME payments, phased in over five years, for services provided to Medicare HMO enrollees under Part C.  See BBA '97 §§ 4622, 4624 (codified at 42 U.S.C. §§ 1395ww(d)(11), 1395ww(h)(3)(D)(I)).

II.  Background and Prior Proceedings

Plaintiffs allege that they were improperly denied supplemental medical education payments by their intermediary, Mutual of Omaha, for the 1999 and 2000 fiscal years.  See

Hosp. of Univ. of Penn v. Sebelius, 634 F. Supp. 2d 9, 11 (D.D.C. 2009) ("HUP I").  After the

fiscal intermediary denied payment, plaintiffs timely appealed to the PRRB.  Id. at 11.  Plaintiffs

argued that, under the applicable regulations, the claims filing requirements do not apply to

claims for supplemental medical education payments.  See Administrative Record ("A.R.") at 59.

Specifically, plaintiffs contended that the "timely filing guidelines" — that is, the deadlines — at

42 C.F.R. § 424.44 do not apply to claims for IME/GME payments for services provided to

Medicare Part C enrollees.  See id.  Plaintiffs now also maintain that they never received

adequate notice that the Secretary would apply the claims filing requirements to the

supplemental medical education payments.  See Compl. ¶ 71.  Plaintiffs also argue that the

application of the claims filing requirements to claims for supplemental education payments

violates the Paperwork Reduction Act, 44 U.S.C. § 3501 et seq., because the Secretary did not

seek OMB approval of the filing requirements.  See Compl. ¶¶ 123-35.  Finally, plaintiffs argued

to the PPRB that whatever the resolution of the legal question, they had in fact complied with the

filing requirements and deadlines of 42 C.F.R. § 424.44 by mailing appropriately coded UB-92s

to their fiscal intermediary in a timely fashion.  See A.R. at 59.  Plaintiffs produced various

forms of evidence in support of this claim to the PRRB at a hearing on May 15, 2007.   See HUP

I, 634 F. Supp. 2d at 12.

　　　　With respect to the legal issue, the Board agreed with plaintiffs that "[t]he claims in

question . . . are specifically exempt from the requirements, procedures, and time limits" of 42

C.F.R. § 424.  A.R. at 63.  The Board explained that the regulations had not been changed after

the enactment of BBA '97 and, by the text of the regulation, the exception at 424 C.F.R. § 434.30

applied, thereby exempting these claims from the requirements.  See id. at 63-65.  The Board

therefore concluded that "the Intermediary improperly denied the Providers' submission of

IME/[GME] claims for Medicare managed care enrollees due to untimely filing, and the Provider should be given the opportunity to support its claim for payment." Id. at 65. In considering the factual dispute, the PRRB wrote that "[t]he evidence in this case was conflicting" and that it "finds [plaintiffs'] evidence that it filed claims credible, but there is no evidence that the claims were proper for processing." Id. at 63. Nonetheless, the PRRB deemed the factual issue moot in light of its resolution of the legal issue. Id. One member of the PRRB dissented, finding that the regulatory exception did not apply and that plaintiffs had not provided sufficient evidence they mailed the claims. Id. at 67-69.

The intermediary appealed to the Administrator pursuant to 42 U.S.C. § 1395oo(f). The Administrator devoted most of his analysis to the legal question and reversed, concluding that the § 424.44 requirements do apply to claims for supplemental medical education payments while addressing the factual dispute only briefly. See A.R. at 7-17. Citing the PRRB dissent, the Administrator found that plaintiffs had not established that they had timely mailed UB-92s to the intermediary. Id. at 18. Plaintiffs then appealed to this Court for review.

The Court considered plaintiffs' original suit together with a similar case against the Secretary, Cottage Health Systems v. Sebelius, 631 F. Supp. 2d 80 (D.D.C. 2009). In Cottage Health, the Court assessed the plaintiff's allegation that it did not receive adequate notice that health care providers were required to file UB-92s directly with fiscal intermediaries for the IME/GME payments authorized by BBA '97. Id. at 95. The Court concluded that the Administrator's decision that the plaintiff had been notified of the requirement to file UB-92s with fiscal intermediaries was supported by substantial evidence. Id. The Court found that four documents — three issued by the Secretary to hospitals generally and a letter pertaining only to the Cottage Health plaintiff — supported the Administrator's decision with respect to notifying

health care providers of the requirement to file UB-92s with fiscal intermediaries.  Id. at 96.  The three documents issued by the Secretary were a May 12, 1998 rule published in the Federal Register, a July 1, 1998 Program Memorandum (PM A-98-21), and a July 13, 1998 Medicare Bulletin.  See id. at 95-96.  The Court found that the Program Memorandum clearly explained that hospitals must submit UB-92s to fiscal intermediaries for the additional IME/GME payments.  Id. at 96.

Although Cottage Health upheld the Secretary's determination with respect to notice to hospitals of the requirement to file UB-92s with intermediaries, the Court concluded that the Administrator had not explained in sufficient detail why the plaintiff was notified that the UB-92s must be filed within a specific time frame.  Id. at 98-99.  The Court noted that the Administrator "did not point to any rule or informal notice that explicitly incorporated the time limits."  Id. at 98.  Accordingly, the Court remanded to the Secretary "for further explanation as to whether the time limits from 42 C.F.R. §§ 424.30 and 424.44 apply, and if so, why."  Id. at 99.  The Court also remanded for the Administrator to address the argument that the Paperwork Reduction Act required OMB approval before the implementation of the claims filing requirements.  See id. at 99-100.

In its prior decision involving the present parties (HUP I), the Court relied on Cottage Health for resolution of the legal issues.  Noting that "the methods of providing notice to hospitals" of the filing requirements are "identical, with limited exception" to the notice considered in Cottage Health, the Court determined that the Administrator's rationale for finding that plaintiffs had notice that the time limits from § 424.44 applied was too cursory for reasoned

review.  HUP I, 634 F. Supp. 2d at 14.[4]  The Court remanded to the Secretary for further

examination and explanation of whether plaintiffs received adequate notice of the time limits.

Id.

        With respect to the factual dispute present here but not in Cottage Health — whether

plaintiffs did, indeed, file UB-92s within the relevant time limits — the Court concluded that the

Administrator's exclusive focus on documentary evidence was "'not in accordance with the law.'"

Id. at 15 (quoting 5 U.S.C. § 706(2)(A)).  The Court therefore vacated and remanded to the

Secretary to determine whether plaintiffs' testimonial and documentary evidence together was

sufficient to prove that the UB-92s were mailed to, and hence may be deemed received by, the

intermediary.  Id.[5]

        Subsequently, the district court in Loma Linda ruled on a hospital's claim that it did not

receive notice of the deadlines for filing claims for IME/GME payments for Part C enrollees.

That court considered the same three documents from HHS — the May 12, 1998 rule, Program

Memorandum A-98-21, and the July 13, 1998 Medicare Bulletin — that this Court had

considered in Cottage Health and HUP I.  See Loma Linda, 684 F. Supp. 2d at 52-53.  The court

noted that "there is no language in any of those documents regarding time limits, nor is there any

mention of 42 C.F.R. § 424.44, the regulation governing deadlines for Part A claims."  Id. at 53.

The court also noted that the Administrator did not "identify any other agency publication

informing hospitals that bills for []GME and IME costs associated with Medicare+Choice

_____

[4] The Court, as in Cottage Health, also affirmed the Secretary's determination that, time limits aside, hospitals
received notice of the need to file UB-92s.  HUP I, 634 F. Supp. 2d at 13-14.  Likewise, the Court remanded for
consideration of the Paperwork Reduction Act issue.  Id. at 14.
[5] With respect to whether the UB-92s, if mailed, were properly coded, the Court concluded that the Administrator
did not make a finding, leaving the Court with no decision to review, and instructed the Administrator to consider
the issue if she determined that plaintiffs had, in fact, presented sufficient evidence of mailing.  HUP I, 634 F. Supp.
2d at 15-16.

enrollees were subject to Part A regulations generally or to the deadlines in 42 C.F.R. § 424.44 in particular."  Id.

The Loma Linda court held that the Secretary "did not inform hospitals" that the Part A time limits applied to claims for IME/GME payments for Part C enrollees and therefore "Loma Linda's delay in filing is not a basis for rejecting the hospital's claims."  Id. at 54, 56.  In so deciding, the court rejected the Secretary's "insist[ence] that Loma Linda knew of the deadline for submitting the bills at issue here."  Id. at 54.  The Court also rejected the Administrator's determination that the three documents from CMS "implicitly put Loma Linda on notice" and the Administrator's reasoning that "requiring hospitals to submit UB-92 forms indicated that the Part C medical education payments would fall under the Part A regulations."  Id.  The court stated instead that "[a]s far as the Court can ascertain from the record before it, Loma Linda first learned of the filing deadlines when it sought payment for unbilled claims and was informed by the intermediary and CMS that the request was untimely."  Id.[6]  On appeal, the D.C. Circuit affirmed the district court's grant of partial summary judgment in a short, per curiam opinion. The court stated:  "Appellee did not receive notice 'with ascertainable certainty,' Gen. Elec. Co. v. EPA, 53 F.3d 1324, 1329 (D.C. Cir. 1995), of the billing deadline for seeking payment for medical education costs associated with Medicare+Choice (Part C) inpatient days."  Loma Linda, 408 Fed. Appx. 383.[7]

III.  Secretary's Remand Decision

_____

[6] In addition to not filing its claims for payment within the time limits, Loma Linda, unlike plaintiffs, was unable to file all of its claims in UB-92 format.  See Loma Linda, 684 F. Supp. 2d at 48.  Loma Linda sought to receive payment by reporting the information in alternative form, which the Administrator denied. See id. at 48-49, 50.  On review, the court, in addition to its finding regarding notice of the timeliness requirements, also concluded that the Secretary did not sufficiently explain the rejection of Loma Linda's request to file in alternative form and remanded to the Secretary for further explanation.  Id. at 56-58.
[7] The court also affirmed the district court with respect to requiring the Secretary to further consider Loma Linda's "proposed alternative computation method."  408 Fed. Appx. 383.

On remand in the present case, the Administrator considered this Court's prior decisions, Loma Linda, the record, and further arguments made by plaintiffs.  The Administrator concluded that the regulations at 42 C.F.R. § 424.30, et seq., including the relevant deadlines, apply to these claims for IME/GME payments for Part C enrollees.  See A.R. at 2504-2512.  In reaching this conclusion, the Administrator quoted the relevant language from 42 C.F.R. § 434.30:  "Claims must be filed in all cases except when services are furnished on a prepaid capitation basis by a health maintenance organization (HMO), a competitive medical plan (CMP), or a health care prepayment plan (HCPP)."  Id.  at 2504.  The Administrator then stated:

> The claims at issue are not for "services furnished on a prepaid capitation basis by a health maintenance organization."  The services are related to the IME/GME teaching costs attributable to inpatient services provided to managed care enrollees.  The payment at issue has been specifically carved out of the Part C capitation rates and is specifically being made to hospitals under the authority set forth in Part A.  The intent of the exclusion is to prevent the double payment for the same service under Medicare fee-for-service (Parts A and B) and also under Part C.  A hospital (not a managed care organization) must submit claims in conformity with 42 CFR 424.30, et seq., to be able to receive managed care enrollees for the Part A IME and GME payments from its intermediary.

Id.  The Administrator concluded that "the provision for this additional payment for managed care enrollees is within [a] framework of a pre-existing methodology for IME/GME payments under Medicare Part A and not under the exception at 42 CFR 424.30 provided for Medicare Part C claims."  Id. at 2509.  The Administrator further stated that "[t]he requirement that a Provider submit a claim UB-92 form cannot be separated from the requirement that it be filed within the prescribed timeframes for such a form under 42 CFR 424.30, et seq[]."  Id. at 2510.  The Administrator also stated that, "[a]mong other things, Congress specifically statutorily excluded the payment under Part C, [and] Congress specifically included the payment under the Medicare inpatient Part A section of the Medicare Act . . . ."  Id. at 2511-12.

The Administrator also considered the notice issue. <u>See id.</u> at 2510-12. The Administrator stated that "[t]o suggest that a provider might believe there are no deadlines would be unwarranted" because "[t]hat is contrary to every provider's general practice and experience in receiving payment under Medicare." <u>Id.</u> at 2510. The Administrator concluded that "the teaching hospital community and its associations knew the filing of the UB-92 form was, <u>like all other claims</u>, required to be done within the usual timeframes." <u>Id.</u> at 2511. The Administrator wrote that the "irrefutable connection between using the UB92 form for payment and need to timely file the form within the normal filing deadlines is evident in the November, 2, 1999 'Memorandum from the American Association of []Medical Colleges,'" which plaintiffs received in November 1999. <u>Id.</u> The Administrator noted that the American Association of Medical Colleges ("AAMC") memorandum "specifically indicates that claims for services rendered in 1998 must be filed by December 31, 1999." <u>Id.</u> Later in the Administrator's decision (though in a discussion of whether plaintiffs had presented factual evidence of having mailed the claims, not a discussion of notice), the Administrator also stated that plaintiffs' "upper management was aware of the deadlines," citing the AAMC memorandum (as well as other documents that did not actually reference the deadlines). A.R. at 2545.[8]

The Administrator next considered the factual question of whether plaintiffs had, in fact, presented sufficient evidence of mailing these claims to their fiscal intermediary. <u>See</u> A.R. at 2516-2548. The Administrator concluded that plaintiffs "did not present sufficient evidence to trigger the presumption of mailing," largely because plaintiffs failed to present evidence that items intended to be mailed actually reached the U.S. Postal Service from plaintiffs' facilities, which the Administrator deemed an important gap in plaintiffs' evidence. <u>See id.</u> at 2542-47.

---

[8] The Administrator also considered and rejected plaintiffs' legal argument involving the Paperwork Reduction Act. <u>See</u> A.R. at 2512-16.

The Administrator also concluded, assuming arguendo that plaintiffs' provided evidence "trigger[ing] the presumption of mailing," that the intermediary rebutted that presumption with its evidence.  See id. at 2547-48.[9]

Finally, in a brief concluding paragraph, the Administrator distinguished Loma Linda from the plaintiffs' situation.  The Administrator stated:

> First, the Administrator is reviewing this case pursuant to a specific remand order. Second, each case is based on its own distinct factual record.  For example, this record shows that [plaintiffs] were aware of the deadline for filing claims as was the larger community and that the instruction to file a UB92 claim was understood to involve the deadlines for filing . . . [.]  Third, the court has already made clear that this case could be resolved on a narrower factual issue distinct from that presented in the Loma Linda case based on whether the claims can be found to be timely filed.

A.R. at 2549.

IV.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  In a case involving review of a final agency action under the Administrative Procedures Act, 5 U.S.C. § 706, however, the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record.  See N.C. Fisheries Ass'n v. Gutierrez, 518 F. Supp. 2d 62, 79 (D.D.C. 2007).  Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  See Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985).  Summary judgment thus serves as the mechanism for deciding, as a matter of

---

[9] The Administrator also briefly considered whether the UB-92s were, if actually mailed, properly coded, and concluded that the record would not support that conclusion.  See A.R. at 2549.

law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.  See Richards v. INS, 554 F.2d 1173, 1177 & n. 28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

Under the APA, a court may vacate an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it is "unsupported by substantial evidence."  5 U.S.C. §§ 706(2)(A), (E).  Agency actions are entitled to much deference, and the standard of review is narrow.  See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  The reviewing court is not permitted to substitute its judgment for that of the agency.  See id.  That is, it is not enough for the agency decision to be incorrect — as long as the agency decision has some rational basis, the court is bound to uphold it.  See id. The court may only review the agency action to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Id.

V.  Analysis

As described below, the Court finds that plaintiffs were not notified of the timing requirements for the filing of IME/GME claims for Part C enrollees.  Since the deadlines cannot be enforced against plaintiffs without notice, the Court need not decide whether the deadlines are, notice aside, actually proper under HHS regulations.  Nonetheless, the regulations merit some discussion to the degree that the regulatory text affects how much notice HHS must provide of its interpretation of the regulations.

a. Administrator's Decision and Parties' Current Arguments

Plaintiffs assert that they did not receive adequate notice that the deadlines for filing claims under Medicare Part A also applied to claims for the additional IME/GME payments

mandated by BBA '97 for Medicare Part C enrollees.  See Pls.' Mem. in Supp. of Mot. for

Summ. J. [Docket Entry 11-1] ("Pls.' Mem.") at 13-16.  Plaintiffs also contend that, even if they

were properly notified of the deadlines, the deadlines themselves are improper because they are

contrary to HHS regulations.  See id. at 20-26.  More specifically, plaintiffs contend that the

claims they filed fall within the exception to the regulations that applies "when services are

furnished on a prepaid capitation basis by a health maintenance organization."  See id. at 21-23.

On remand, as explained above, the Administrator concluded that these claims do not

come under the regulatory exception.  The Administrator also concluded that plaintiffs received

notice of the deadlines — or, more precisely, that "the teaching hospital community," which

includes the plaintiffs, "and its associations knew the filing of the UB-92 form was, like all other

claims, required to be done within the usual timeframes," A.R. at 2510, and that plaintiffs,

specifically, were "aware of the deadlines," A.R. at 2545.

The Secretary now argues both that the timing deadlines apply to these claims and that

plaintiffs had "actual notice" of them.  With respect to whether the deadlines apply, the Secretary

quite appropriately echoes the Administrator's decision on remand.  See Mem. of P. & A. in

Supp. of Def.'s Cross-mot. for Summ. J. and in Opp'n to Pls.' Mot. for Summ. J. [Docket Entry

12] ("Def.'s Cross-mot.") at 10-14.  First, the Secretary explains that IME/GME payments under

Part A predated Medicare Part C and are based on a different methodology than Part C

payments, which are "capitated" payments that the Secretary makes to HMOs, not hospitals.  Id.

at 11-12.  Second, the Secretary argues that Congress specifically carved out IME/GME

payments from Part C, so the payments fall under Part A and are linked to the existing

methodology for filing Part A claims.  Id. at 12-13.  Third, the Secretary notes that the purpose of

the exception clause is to prevent double payment for the same service — that is, to prevent

hospitals from receiving payment both from fiscal intermediaries and from HMOs for services provided to patients under Part C.  Since hospitals receive payment for IME/GME costs only from fiscal intermediaries and not from HMOs, applying the exception to claims for IME/GME payments would not serve the purpose of the regulation.  Id. at 31.

With respect to whether plaintiffs were notified of the deadlines, the Secretary's argument now deviates somewhat from the Administrator's remand decision.  To begin with, the Secretary argues that plaintiffs waived their notice argument by failing to raise the notice issue in either the initial proceedings at HHS or the initial suit in this Court and "conceded" at those times that they were aware of the deadline.  Def.'s Cross-mot. at 7-8.  The Secretary notes that plaintiffs moved for reconsideration of the Court's decision in HUP I in part because, according to plaintiffs, they did not "frame their appeal" in terms of notice as the Cottage Health plaintiff had.  Id. at 8 n.3; see Pls.' Mem. of P. & A. in Supp. of Mot. for Recons. and Clarification at 4, HUP I (No. 08-1665).  Likewise, the Secretary notes that plaintiffs' original complaint in HUP I stated that plaintiffs timely filed their claims after receiving warnings through "'the grapevine'" and from the AAMC that the Secretary had decided to require hospitals to file these claims within the time limits applicable for Part A claims.  See Def.'s Reply to Pls.' Opp'n to Def.'s Cross-mot. for Summ. J. [Docket Entry 17] at 3; see Compl. ¶¶ 69-70, HUP I (No. 08-1665).

Next, the Secretary argues that Loma Linda did not foreclose a finding that plaintiffs had "actual notice" of the deadlines.  See Def.'s Cross-mot. at 8-10.  The Secretary notes that plaintiffs, in their correspondence with the intermediary following the rejection of their claims, did not claim ignorance of the timing rules but rather maintained that they complied with (in the words of plaintiffs' employee) "the required deadline."  Id. at 9 & n.5.  Although the Secretary concedes that the AAMC memorandum cannot serve as notice of the Secretary's interpretation

because it did not actually come from the Secretary, the Secretary contends that plaintiffs themselves indicated that they understood from the AAMC memorandum "what the Secretary's deadlines were."  See id. at 10.  At a motions hearing before the Court, counsel for the Secretary also noted that the court in Loma Linda did not consider the AAMC memorandum in reaching its conclusion that the Secretary "did not inform hospitals" of the deadlines, 684 F. Supp. 2d at 54; counsel argued that the court might have come to a different conclusion if it had considered the memorandum.

b.  Agency Notice When Regulations Not Clear

There is a relationship between the need for agencies to notify regulated parties of regulatory requirements and the text of the regulations that set out those requirements.  When the text of regulations administered by an agency is clear, the agency need not provide other notice to regulated entities because the regulations themselves provide notice.  See Gen. Elec. Co. v. EPA, 53 F.3d 1324, 1329 (D.C. Cir. 1995) ("[W]e must ask whether the regulated party received, or should have received, notice of the agency's interpretation in the most obvious way of all: by reading the regulations.").  But when regulations can reasonably be interpreted in a way other than the agency does, the agency must give regulated entities notice before enforcing requirements based on that interpretation.  See Satellite Broad. Co., Inc. v. FCC, 824 F.2d 1, 3-4 (D.C. Cir. 1987).  The D.C. Circuit has endorsed the "ascertainable certainty" standard for providing fair notice of regulatory requirements:  "If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation."  General

Electric, 53 F.3d at 1329 (quoting Diamond Roofing Co v. OSHRC, 528 F.2d 645, 649 (5th Cir. 1976)).

In the Court's view, this case presents a situation that is arguably the reverse of the situation in which clear regulations provide notice to regulated parties, because here the agency's interpretation of its regulation may actually contradict the regulatory text. Of course, an agency's interpretation of its own regulations is entitled to substantial deference, and the Court need not and will not decide whether the Secretary's interpretation of the regulations is sustainable; that question need not be reached if the Court finds that the agency loses on notice grounds. See General Electric, 53 F.3d at 1329-30 (citing Gates & Fox v. OSHRC, 790 F.2d 154, 155 (D.C. Cir. 1986)). Nonetheless, in the Court's view, when an agency's reading of the relevant regulation is, to put the point mildly, quite strained, then the obligation on the agency to provide adequate notice is at its peak, because a reasonable reader of the regulations could quite naturally reach a conclusion contrary to that reached by the agency.

c. 42 C.F.R. § 424

Under Medicare Part A, hospitals file UB-92s with fiscal intermediaries to receive "fee-for-service" payments for the services provided to Medicare enrollees. By contrast, in order to be paid for services provided to Medicare Part C enrollees, providers like plaintiffs file UB-92s with HMOs. The claims that hospitals file with fiscal intermediaries for IME/GME payments associated with Part C enrollees are so-called "no pay" UB-92s. The claims are "no pay" bills because Medicare is not paying the hospitals for those services (as under the Part A "fee-for-service" model). Plaintiffs have stated that they generated the "no pay" bills by photocopying the original UB-92s (the "pay" bills, filed with HMOs) and then adding codes to distinguish them as "no pay" bills. The question is whether these "no pay" bills, filed with fiscal intermediaries for

IME/GME payments relating to Part C services, are subject to the same regulatory requirements as ordinarily apply to claims filed with fiscal intermediaries under Medicare Part A.

As indicated above, the Secretary's requirements for filing claims under Medicare Part A, including the time limits, are set out at 42 C.F.R. § 424.30, et seq.  42 C.F.R. § 424.30 describes what claims the requirements apply to:  "This subpart sets forth the requirements, procedures, and time limits for claiming Medicare payments.  Claims must be filed in all cases except when services are furnished on a prepaid capitation basis by a health maintenance organization (HMO), a competitive medical plan (CMP), or a health care prepayment plan (HCPP)."  Services provided to Medicare Part C enrollees are "services [that] are furnished on a prepaid capitation basis by a health maintenance organization."  The regulation therefore effectively reads, in relevant part:  "Claims must be filed in all cases except when services are furnished" under Part C.

On remand, the Administrator stated that "[t]he claims at issue are not for 'services furnished on a prepaid capitation basis by a health maintenance organization.' The services are related to the IME/GME teaching costs attributable to inpatient services provided to managed care enrollees."  A.R. at 2504.  This statement is true, but it does not track the regulation's text.  The regulation does not except claims "for 'services furnished'" under Part C, as the Administrator states.  The Secretary's reading, then, rewrites the regulation's text as:  "Claims must be filed in all cases except when the claim is for services that are furnished on a prepaid capitation basis by a health maintenance organization . . . ."  But the regulation instead states that "[c]laims must be filed in all cases except when services are furnished" under Part C (emphasis added).  And these claims were claims filed when (that is, in cases in which) services were furnished to enrollees under Part C.  They were not claims for those services, but the regulation

is written with reference to how the services are furnished, not what the claims being filed are for.

The Court is not the first to make this point.  The Provider Reimbursement Review Board, in its initial review of this case, concluded that "the IME/[GME] payment arises from 'services . . . furnished on a . . . capitation basis,'" and that therefore the claims fall under the exception to the § 424 requirements.  See A.R. at 65.  As the Board described, the regulations at issue pre-date BBA '97 and simply were not crafted with an eye toward the present situation, in which duplicate claims are filed with intermediaries in cases when services are furnished on a prepaid capitation basis by an HMO and the Secretary has a separate payment obligation associated with those services.  See id. at 63-65.[10]  Of course, as the Secretary correctly indicates, the Administrator's decision, not the Board's, is the final decision of the agency.  See, e.g., Am. Med. Int'l, Inc. v. Sec'y of Health, Educ. and Welfare, 466 F. Supp. 605, 611 (D.D.C. 1979), aff'd, 677 F.2d 118 (D.C. Cir. 1981).  Nonetheless, that the Board, with its substantial Medicare expertise, read the regulations as requiring these claims to be exempted from the requirements suggests that specialized knowledge of the subject matter does not change the meaning of the regulation's plain text.

The Secretary has not really tried to dissuade the Court from concluding that her interpretation is a rewriting of the regulatory text.  The Secretary points out that IME/GME services are not "services furnished on a prepaid capitation basis" by HMOs; instead they are ongoing payments made by the Secretary, on the basis of a formula (not prepaid per capita).  But,

---

[10] The Board concluded that since the exception applied, not only the deadlines but also the underlying requirement to file UB-92s with fiscal intermediaries was contrary to the regulations.  See A.R. at 65.  The Court previously concluded that the Secretary did adequately notify hospitals of the requirement to file UB-92s.  See HUP I, 634 F. Supp. 2d at 13-14.  Since the Court concludes that plaintiffs were not notified of the deadlines, and plaintiffs will therefore receive the relief sought here (payment) through the processing and payment of their untimely claims, the Court need not address whether, notice aside, the underlying requirement to file UB-92s was improper under the regulations, as the Board concluded.

again, the regulatory exception is not based on what services the payment is being made for. Rather, the regulation refers to "cases when services are furnished" under Part C, which is the case for these claims.  Indeed, the IME/GME claims are just recoded versions of the claims earlier filed for services furnished under Part C.

Rather than focusing on the regulatory text, the Secretary instead focuses primarily on how much sense it would make to apply the § 424 requirements to these claims.  And, indeed, her arguments for applying the requirements to these claims do make some sense.  The "no pay" claims are, from the perspective of filing and payment, no different from any other claims filed with fiscal intermediaries, so it would be logical to apply the same rules, including timing deadlines.  Health care providers are accustomed to the rules; in fact, they are accustomed to filing claims with these very forms (UB-92s) under these rules.  Not applying the timing rules could mean that health care providers can file claims whenever they want — not a particularly reasonable state of affairs.  Furthermore, the purpose of the exception clause in § 424.30 is to prevent providers from inappropriately filing fee-for-service claims with fiscal intermediaries, since claims for payment for the services are filed with HMOs.  That purpose is not served by including "no pay" claims in the exception, because such claims are only filed with intermediaries.  Finally, Congress instructed the Secretary to "carve out" IME/GME payments from Part C, so it makes little sense for the treatment of the claims to differ because they are associated with Part C services.  And plaintiffs have not put forward much of a reason, compelling or otherwise, why it makes sense for the requirements not to apply to these claims.[11]

---

[11] The closest plaintiffs have come to suggesting why the ordinary requirements ought not to apply to these claims — although the argument is framed regarding plaintiffs' claims under the Paperwork Reduction Act, not the interpretation of 42 C.F.R. § 424.30 — is that filing "no pay" UB-92s is repetitive and expensive.  See Pls.' Mem. at 31-32.  But, of course, this objection is to the requirement to file no pay UB-92s at all, not to the deadlines; plaintiffs have not articulated any reason why, given the requirement to file "no pay" UB-92s, the regular deadlines should not apply.

Of course, the Secretary could solve the problem simply by changing the regulation to clearly express her interpretation, but she has not done so.  More to the point here, the Court need not resolve this apparent tension between the plain meaning of the regulatory text and a reading that would make more sense as a matter of policy and accordance with the statute.  Since the Court will decide the case on notice grounds, it need not determine whether the Secretary's interpretation is sustainable on the basis of the substantial deference owed to HHS in interpreting its own regulations.  What is clear is that, given how the regulations read, the Secretary was obliged to provide fair notice to regulated parties about how she was interpreting the regulations — an interpretation at odds with the literal language of § 424.30.  The regulations themselves certainly do not provide such notice.   On the contrary, a regulated entity relying on the regulations would likely come to the opposite conclusion, making notice from the Secretary of paramount importance.

d.  Notice

This Court has already concluded that the Secretary gave hospitals, including plaintiffs, notice of the requirement to file with their fiscal intermediaries "no pay" UB-92s for Medicare Part C enrollees in order to receive IME/GME payments.  See HUP I, 634 F. Supp. 2d at 13-14; Cottage Health, 631 F. Supp. 2d at 95-97.  This notice came in the form of a July 1, 1998 Program Memorandum that "clearly stated that 'hospitals must submit a claim' for the additional IME/GME payments 'to the hospitals' regular intermediary in UB-92 format.'" Cottage Health, 631 F. Supp. 2d at 96 (quoting Program Memorandum).  This memorandum, however, contained no mention of the deadlines that the Secretary now insists accompanied the use of the UB-92s. The district court in Loma Linda considered the same documents issued by the Secretary and concluded that hospitals did not receive notice of the timing deadlines.  684 F. Supp. 2d at 56.

The D.C. Circuit affirmed that determination, concluding that Loma Linda "did not receive notice 'with ascertainable certainty.'" 408 Fed. Appx. 383.

Regarding notice, the only difference between this case and <u>Loma Linda</u> is the AAMC memorandum.  That memorandum did indicate that the relevant deadlines applied to these claims.  It stated:  "This memorandum is to remind you that December 31, 1999 is the deadline for submitting Medicare+Choice shadow claims to your fiscal intermediary for purposes of receiving [GME] or [IME] payments for the period January-September, 1998."  A.R. at 2511.  The memorandum did not come from HHS, nor did it reference any official HHS source for this statement.  Plaintiffs agree that they received the memorandum in November 1999 and attempted — successfully, they maintain — to file "no pay" claims by year-end.[12]

The question for the Court is whether the receipt of the AAMC memorandum, and plaintiffs' action to conform their conduct to it, requires a different determination than that reached in <u>Loma Linda</u>.[13]  The parties agree, as does the Court, that the sole fact that the AAMC sent the memorandum and plaintiffs received it is insufficient to provide notice, since the AAMC is a third party, not the Secretary's agent.  <u>See</u> <u>Gates & Fox</u>, 790 F.2d at 156-57 (finding inadequate notice when warning "came not from OSHA but from the general contractor's safety inspector, and was therefore not an authoritative interpretation of the regulation").  Rather, the Secretary maintains that what distinguishes this case from <u>Loma Linda</u> is that plaintiffs here "knew" or "understood" the deadlines, indicating that they had "actual notice" of them.  In other words, since plaintiffs gathered, from the AAMC memorandum, that the deadlines applied and

---

[12] More precisely, plaintiffs indicate that staff was instructed to file "no pay" UB-92s beginning in February 1998, and then performed a "massive search of records and bill[ing]" (by their account, a "rebilling") after receiving the AAMC memorandum in November 1999.  <u>See</u> A.R. at 2522-23, 2527.

[13] The district court in <u>Loma Linda</u> stated that CMS "did not inform hospitals" (plural) of the decision to apply the Part A regulations to claims for IME/GME payments associated with Part C enrollees.  <u>See</u> 684 F. Supp. 2d at 54.  On the other hand, the D.C. Circuit framed its affirmance in terms of "[a]ppellee" — that is, Loma Linda specifically.  408 Fed. Appx. 383.  To what degree these locutions were purposeful is not clear.

took action as such, plaintiffs were not prejudiced by the fact that the Secretary did not actually inform them of the deadlines.  By contrast, <u>Loma Linda</u> concluded that "neither the Administrator's decision nor the Secretary's filings to this Court identify any evidence in the record that Loma Linda was aware of the deadline for filing."  684 F. Supp. 2d at 55.

The Administrator's decision on remand in this case suggests unacceptable non-acquiescence to <u>Loma Linda</u> — <u>i.e.</u>, to D.C. Circuit law.  The Administrator incorporated the AAMC memorandum into her analysis not as an indication that these plaintiffs, specifically, understood the timing requirements, but rather as evidence that hospitals generally did so — the very conclusion rejected by <u>Loma Linda</u>.  The Administrator thus wrote that the "irrefutable connection between using the UB92 form for payment and need to timely file the form within the normal filing deadlines is evident in" the AAMC memorandum.  A.R. at 2511.  And the Secretary reiterated that "the teaching hospital community and its associations knew the filing of the UB-92 form was, <u>like all other claims</u>, required to be done within the usual timeframes."  <u>Id.</u> at 2511.  The Court finds this language objectionable.  A court of this district, affirmed by the D.C. Circuit, has explicitly ruled that there was no "irrefutable connection" between using UB-92s and the timing deadlines.  The Administrator's stubborn repetition of this argument is unacceptable.

The Secretary has tried to rehabilitate the Administrator's statements by pointing out that the courts in <u>Loma Linda</u> might have reached a different conclusion had the record in that case contained the AAMC memorandum.  Fair enough, but that is not quite what the Administrator said on remand.  The D.C. Circuit has already considered the Administrator's contention that the use of UB-92s notified hospitals of the deadlines.  The Administrator lost that argument in <u>Loma Linda</u>.

In any case, the Court will consider the Secretary's present argument that plaintiffs had "actual notice" because they "knew" of the relevant deadlines, even though the Administrator did not base her remand decision on this specific reason.  See Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 (D.C. Cir. 1995) ("A reviewing court will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'") (quoting Bowman Transp., Inc. v. Arkansas-Best Motor Freight Sys., 419 U.S. 281 (1974)).  To be fair, the Administrator did note, albeit elsewhere in her decision, that plaintiffs, specifically, were "aware of the deadlines."  A.R. at 2524.

The issue, then, is whether plaintiffs' "knowledge" of the relevant deadlines constitutes "actual notice" from the Secretary.  The Secretary relies on cases from the notice-and-comment rulemaking context indicating that "even if the agency has not given notice in the statutorily prescribed fashion, actual notice will render the error harmless."  Small Refiner Lead Phase-down Task Force v. EPA, 705 F.2d 506, 549 (D.C. Cir. 1983) (citing Sierra Club v. Costle, 657 F.2d 298, 355, 360, 398-99 (D.C. Cir. 1981)).  The Secretary notes that plaintiffs, in correspondence with the fiscal intermediary about these claims (in 2003), referred to "the required deadline" for filing the claims; plaintiffs then stated that they "received notification from the [AAMC]" that the claims "had to be submitted by December 31, 1999."  Def.'s Cross-mot at 9-10; see A.R. at 893.

Plaintiffs rely principally on General Electric for the proposition that "notice must be provided either from the face of the regulations or by other 'statements issued by the agency.'" Pls.' Mem. in Opp'n to Def.'s Cross-mot. and in Reply to Def.'s Opp'n to Pls.' Mot. for Summ. J. [Docket Entry 16] at 6 (quoting General Electric, 53 F.3d at 1329).  In the "ascertainable certainty" passage from General Electric cited by the D.C. Circuit in Loma Linda, the court

focused the inquiry on whether the agency had "fairly notified" regulated parties through its "regulations and other public statements." General Electric, 53 F.3d at 1329. Plaintiffs have also cited several cases in which the D.C. Circuit's language similarly implies that notice must come from the agency itself. See, e.g., Trinity Broad. of Fl., Inc. v. FCC, 211 F.3d 618, 628 (D.C. Cir. 2000) ("We thus ask whether 'by reviewing the regulations and other public statements issued by the agency a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform . . . .'") (quoting General Electric, 53 F.3d at 1329). However, plaintiffs do not cite any cases that explicitly consider and reject the Secretary's position that "actual notice" can be based on what the regulated party knew or understood from sources other than the agency.

In the Court's view, General Electric did consider what the regulated party "knew," but that consideration took place within a larger discussion of what the agency itself said. General Electric examined at some length the relevant regulations and indications given by the agency about how it was interpreting the regulations. See 53 F.3d at 1330-33. The court also briefly considered the government's argument that the regulated party received "actual notice" of the regulatory requirements. See id. at 1333. In a short few sentences, the court did consider the conduct of the regulated party without any obvious reference to a statement by the agency, before concluding that the party's conduct did not indicate it "knew" of the agency's requirements. See id. ("While GE sought a permit for that alternative, its decision to do so does not mean that it knew EPA required a permit for distillation in itself."). Nonetheless, the bulk of the "actual notice" discussion focused on a letter sent by the agency itself, as well as GE's response to the letter. See id.

On the whole, the Court finds that plaintiffs did not receive adequate notice that the deadlines at 42 C.F.R. § 424.44 applied to the filing of these claims.  Loma Linda concluded that hospitals were not informed by the Secretary's own statements that the deadlines applied to claims for IME/GME payments for Part C enrollees.  Although the Secretary is not wrong that this determination was made without consideration of the AAMC memorandum, the Court does not believe that simply adding this document changes the conclusion reached in Loma Linda. The AAMC memorandum was generated by a third party on the basis of the very statements that Loma Linda found inadequate to provide notice.  The AAMC memorandum did not cite (or otherwise purport to rely on) anything from the Secretary that actually indicated that the deadlines would apply.  The fact that a third party discerned — on the basis of statements that did not themselves give notice — what the Secretary would conclude is simply not enough to change the notice determination.

Hence, Loma Linda's holding — that hospitals generally were not notified by the Secretary of these deadlines — maintains its force on the present record.  The Court must still consider, however, whether these plaintiffs, specifically, received "actual notice" of the deadlines.  On that question, the Court rejects the Secretary's argument that the evidence that plaintiffs "knew" or "understood" the deadlines means that they received "actual notice" of the rules.

The Secretary is conflating plaintiffs' understanding of the regulatory requirements with "actual notice" from the Secretary.  The very concept of "notice" of a regulatory requirement is that the government has appropriately informed the regulated community before penalizing it for noncompliance.  The cases cited by the Secretary stand most clearly for the proposition that an agency need not give notice in a particular manner, rather than the proposition that notice can be

inferred from a regulated party's conduct without actual notification by the agency.  See Small Refiner, 705 F.2d at 549 ("Our cases recognize that even if the agency has not given notice in the statutorily prescribed fashion, actual notice will render the error harmless. . . . As a general rule, EPA must itself provide notice of a regulatory proposal.") (first emphasis added).  These cases are from the notice-and-comment rulemaking context, in which the need for notice from an agency is different from when the agency is penalizing a regulated party on the basis of a regulatory requirement that was not clear.  All the statements from the D.C. Circuit describing the "ascertainable certainty" standard in this context use the word "notice" to refer to what the agency itself told the regulated party or, relatedly, what the regulated party concluded from the agency's own statements.

In General Electric, the court inquired into whether the plaintiff had received "actual notice" by considering whether the plaintiff had been able to glean the agency's expectations from what the agency itself said or whether the plaintiff had been specifically notified by the agency in some manner other than how the general public had been informed.  See 53 F.3d at 1333.  There is no evidence in the record here either that plaintiffs were able to glean the Secretary's conclusion from what the Secretary actually said or that the Secretary informed plaintiffs specifically.  Rather, plaintiffs' "knowledge" of the Secretary's expectations came from a third party's interpretation of the Secretary's own inadequate statements.  Again, that the AAMC interpreted the Secretary's statements in a particular way and informed plaintiffs of that interpretation cannot alter the fact that the notice given by the Secretary was inadequate.  On the basis of what the Secretary herself said, the AAMC might well have been incorrect that the deadlines applied.  Indeed, a straightforward reading of the regulations would suggest that the

AAMC was, in fact, wrong.  And nothing from the Secretary expressed a contrary interpretation of the language of the exception in § 424.30.

To be sure, the Secretary has a valid point that plaintiffs were not obviously prejudiced by the Secretary's failure to give notice.  Plaintiffs contend that they submitted these claims within the deadline upon receiving the AAMC memorandum in November 1999, and it is not clear what, if anything, plaintiffs would have done differently if they had been notified by the Secretary herself.  There is a sense, then, that plaintiffs are benefitting from CMS's mistake when that mistake did not actually harm them.  On the other hand, there also seems to be little question that plaintiffs actually did provide services to these enrollees under Medicare Part C and that, therefore, they are entitled to these payments so long as they complied with the applicable procedural requirements.  If the Secretary wishes to enforce procedural requirements strictly, she must provide notice to regulated parties what those requirements actually are, especially when, as here, the Secretary's own regulations suggest that the requirements do <u>not</u> apply.  Having failed to provide adequate notice, the Secretary's error is not excused simply because plaintiffs attempted to submit their IME/GME claims by the deadline, particularly when the Secretary is strictly enforcing the regulatory procedural requirements against plaintiffs.

In sum, the Secretary did not provide adequate notice to plaintiffs that the timing requirements of 42 C.F.R. § 424.44 applied to their claims for IME/GME payments for enrollees treated under Medicare Part C.  <u>Loma Linda</u> established that the Secretary did not provide hospitals generally with notice that the timing deadlines applied.  The only relevant difference between the present situation and <u>Loma Linda</u> is that here plaintiffs received a memorandum from a third party indicating that the relevant deadlines applied.  Absent any communication whatsoever from HHS, this third party memorandum is insufficient to provide adequate notice to

plaintiffs, regardless of how plaintiffs reacted to or understood that memorandum.  The need for clear notice from the Secretary is especially acute here because the agency's interpretation is at odds with relevant regulatory language.  Hence, plaintiffs did not receive notice of the filing deadlines with "ascertainable certainty," General Electric, 53. F.3d at 1329, and the Secretary's denial of payment to plaintiffs was invalid.

## VI.  Factual Determination and Plaintiffs' Other Claims

In addition to the timing issue, plaintiffs' complaint alleges that the requirement to file "no pay" UB-92s violates the Paperwork Reduction Act, 44 U.S.C. § 3501 et seq., because the Secretary did not receive OMB approval for this requirement.  See Compl. ¶¶ 123-35; see also Pls.' Mem. at 30-33.  In theory, this claim is not mooted by the Court's finding that plaintiffs did not receive adequate notice of the timing requirements, since plaintiffs still need to file UB-92s for 1999 and 2000 even if the deadlines do not apply.  In practice, however, the relief actually sought by plaintiffs —setting aside the Secretary's decision denying plaintiffs' IME/GME payments for fiscal years 1999 and 2000 and requiring payment of those sums, see Compl. at 28-29 — will be effectuated based on the Court's resolution of the notice issue with respect to the timing deadlines.  The Court therefore will not reach the Paperwork Reduction Act claim.[14] Likewise, the Court need not address the Administrator's factual determination that these claims were not actually timely filed.

## VII.  Conclusion

---

[14] Plaintiffs' contention that applying the filing requirements to these claims is inconsistent with 42 C.F.R. § 424 could be construed as an argument against the underlying requirement to file UB-92s.  See Pls.' Mem. at 20-26. Further consideration of this issue is not necessary, however, for the same reason that further consideration of the Paperwork Reduction Act issue is unnecessary.  Plaintiffs also argue that even if their UB-92s had validly been rejected as untimely, they would still be entitled to IME/GME payments based on the principle that cost report settlements must utilize the "best available data."  See Pls.' Mem. at 26-30.  It seems that this argument is primarily directed at the timing requirement (rather than the underlying need to file UB-92s), and so is made moot by the Court's determination that plaintiffs did not receive adequate notice of the timing requirement.

HHS regulations do not clearly require hospitals to file claims for supplemental medical education expenses associated with Medicare Part C enrollees within the ordinary time frames for filing Part A Medicare claims through fiscal intermediaries.  Given the unclear dictates of the regulations, and upon consideration of the record in this case, the Secretary did not provide plaintiffs with adequate notice that the deadlines applied.  The Secretary's decision denying plaintiffs these payments is therefore invalid and the case will be remanded to the Secretary for processing and payment of plaintiffs' fiscal years 1999 and 2000 IME/GME claims.[15]  A separate order has been issued on this date.


                                              /s/
                                    _____
                                    JOHN D. BATES
                                    United States District Judge


Dated:  March 20, 2012

_____

[15] Although plaintiffs' complaint also sought recovery of attorneys' fees and costs, see Compl. ¶¶ 144-50, the Court is not presently inclined to grant such relief.  If plaintiffs still wish to pursue recovery of fees and costs, they may file a motion to that effect, and the Court will consider the issue further at that time.